UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
GREENEVILLE

| | | |
|---|---|---|
| JENNIFER SUE GARLAND | ) | |
| | ) | |
| V. | ) | NO. 2:15-CV-314 |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social Security | ) | |

REPORT AND RECOMMENDATION

This matter is before the United States Magistrate Judge, under the standing orders of the Court and 28 U.S.C. § 636 for a report and recommendation. Plaintiff's applications for Supplemental Security Income and Disability Insurance Benefits were administratively denied following an administrative hearing before an Administrative Law Judge ["ALJ"]. This is an action for judicial review of that final decision. The plaintiff has filed a Motion for Judgment on the Pleadings [Doc.19] while the defendant Commissioner has filed a Motion for Summary Judgment [Doc. 21]. Plaintiff has filed a response to the defendant's motion [Doc. 23].

The sole function of this Court in making this review is to determine whether the findings of the Commissioner are supported by substantial evidence in the record. *McCormick v. Secretary of Health and Human Services,* 861 F.2d 998, 1001 (6th Cir. 1988). "Substantial evidence" is defined as evidence that a reasonable mind might accept as adequate to support the challenged conclusion. *Richardson v. Perales*, 402 U.S. 389 (1971). It must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn is one of fact for the jury. *Consolo v. Federal Maritime Commission*, 383 U.S. 607 (1966). The Court may not try the case *de novo* nor resolve conflicts in the evidence, nor decide questions of credibility. *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if the reviewing court were to resolve the factual issues differently, the Commissioner's decision must

stand if supported by substantial evidence. *Listenbee v. Secretary of Health and Human Services,* 846 F.2d 345, 349 (6th Cir. 1988). Yet, even if supported by substantial evidence, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 746 (6th Cir. 2007).

The applicable administrative regulations require the Commissioner to utilize a five-step sequential evaluation process for disability determinations. 20 C.F.R. § 404.1520(a)(4). Although a dispositive finding at any step ends the ALJ's review, see *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), the complete sequential review poses five questions:

> 1. Is the claimant engaged in substantial gainful activity?
>
> 2. Does the claimant suffer from one or more severe impairments?
>
> 3. Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments (the "Listings"), 20 C.F.R. Subpart P, Appendix 1?
>
> 4. Considering the claimant's RFC, can he or she perform his or her past relevant work?
>
> 5. Assuming the claimant can no longer perform his or her past relevant work — and also considering the claimant's age, education, past work experience, and RFC — do significant numbers of other jobs exist in the national economy which the claimant can perform?

20 C.F.R. § 404.1520(a)(4). A claimant bears the ultimate burden of establishing disability under the Social Security Act's definition. *Key v. Comm'r of Soc. Sec.*, 109 F.3d 270, 274 (6th Cir. 1997).

Plaintiff is a younger individual for Social Security purposes. She has a high school education. There is no dispute that she cannot return to her heavy past relevant work as a certified nursing assistant in a nursing home.

2

Plaintiff's medical history is recounted in the Commissioner's brief as follows:

On April 24, 2008, Plaintiff reported to Dr. Lorio that she had not seen any doctor for lumbar treatment, for an injury that occurred at work and which Dr. Lorio viewed was related to workers' compensation (Tr. 558). He noted that Plaintiff's recent magnetic resonance imaging (MRI) of Plaintiff's back suggested significant posterior displacement of the left S1 nerve root sheath and possible impingement on the right S1 nerve root sheath by a large central paracentral disc protrusion at the L5-S1 level (Tr. 558). Dr. Lorio recommended Plaintiff obtain a lumbar type brace, a nerve conduction velocity study, x-rays to include flexion and extension, and a computer tomography (CT) scan to further evaluate the degree of nerve compromise (Tr. 558). However, the record is void of any further testing.

On May 22, 2008, Plaintiff sought treatment at the Tennessee Health Department symptoms of a cold (Tr. 439). On August 25, 2008, Plaintiff returned to the Health Department for a refill of her medications (Tr. 436). She reported that she had been involved in her workers compensation lawsuit for two years and was seeing a neurologist in Bristol (Tr. 436). The doctor diagnosed her with recurrent herpes, anxiety, depression, and chronic back pain (Tr. 436). On May 14, 2009, Plaintiff returned to the Health Department after running out of medication (Tr. 434). She returned again on July 6, 2009, for medication refills (Tr. 429).

On August 25, 2009, Plaintiff was evaluated by Dr. Brasfield, a neurosurgeon, for an independent medical examination (Tr. 607). Dr. Brasfield reported that there was a question whether Plaintiff's injury was work-related (Tr. 607). Plaintiff reported that she was injured at her work as a CNA, on August 6, 2006, when lifting a patient, but apparently did not report the injury to her employer at that time (Tr. 607, 609). Nevertheless, she reported that she had not been able to work since that time (Tr. 607). Plaintiff was not currently taking medications, as she had ran out of her medications a month earlier (Tr. 607). She also had no primary care physician (Tr. 608). On examination, Plaintiff was in mild distress, but she could straight leg raise to 90 degrees on the right and 80 degrees on the left (Tr. 608). Plaintiff had normal strength of the right leg and decreased strength on toe stand on her left leg (Tr. 608). Plaintiff had no reflex symptom dystrophy and no edema (Tr. 608). She was obese but had normal lordosis of the lumbar spine (Tr. 608). Dr. Brasfield assessed Plaintiff with a work-related injury that caused left-sided disc herniation and radiculopathy (Tr. 608). Dr. Brasfield recommended that Plaintiff undergo surgery but there is no evidence that Plaintiff underwent surgery for her condition (Tr. 609).

On November 1, 2010, Plaintiff returned to the Health Department (Tr. 405). She reported that Celexa medication improved her depressive symptoms (Tr. 405). Plaintiff complained of back pain on December 30, 2010, but her gait was normal (Tr. 401). On January 6, 2011, Plaintiff complained of back pain but her gait remained normal (Tr. 398).

On January 21, 2011, Dr. Vavra, a neurologist, evaluated Plaintiff for

back pain (Tr. 564). Dr. Vavra found Plaintiff had good strength in her lower extremities, but she had diminished sensation in her left leg (Tr. 564). Plaintiff had an antalgic gait but her reflexes were brisk (Tr. 564). On February 3, 2011, Dr. Vavra noted that he reviewed Plaintiff's prior MRIs, the most recent from July 2010, and there was no evidence of lumbar disc herniation or neural foraminal stenosis (Tr. 566). Dr. Vavra suspected Plaintiff's back pain was more mechanical musculoskeletal as she had normal reflexes and strength (Tr. 566).

On November 10, 2012, March 11, 2013, and April 15, 2013, Dr. Webb of Medical Care, PLLC, noted that Plaintiff had normal gait, balance, reflexes, and motor examinations (Tr. 529, 531, 535). Plaintiff was alert and oriented and had a normal mood and affect (Tr. 529, 531, 535).

On December 27, 2012, Dr. Filka conducted a consultative examination of Plaintiff (Tr. 456). Plaintiff alleged low-back, tailbone, and sciatica pain that began around 2006 when she was lifting a patient at work (Tr. 456). Plaintiff had never had back surgery (Tr. 456). Plaintiff also alleged she had osteoarthritis in her elbows, fingers, and hips that began a year previously (Tr. 456). In addition, Plaintiff alleged that she had been in mental health counseling two years previously but had not been since that time (Tr. 456). Plaintiff never had any psychiatric admissions (Tr. 456).

On examination, Dr. Filka noted that Plaintiff's joint appearance and range of motion was full throughout (Tr. 459). Her strength was normal in both her upper and lower extremities (Tr. 459). Her grip strength and fine and gross manipulative skills were normal (Tr. 459). Plaintiff's gait was normal (Tr. 459). She could toe stand, perform a partial squat, and perform one leg standing on alternating legs (Tr. 459). Plaintiff performed postural movements without evidence of difficulty and got on and off the examination table without difficulty (Tr. 459). She had normal range of motion in her cervical and lumbar spine (Tr. 459). On mental status examination, Dr. Filka noted that Plaintiff's mood and affect did not appear to be depressed or anxious and her attention and concentration were appropriate (Tr. 460). Dr. Filka found Plaintiff could lift 20 pounds occasionally and 10 pounds frequently and should avoid operating heavy vibrating equipment (Tr. 460). Dr. Filka also opined that Plaintiff should be allowed to alternate her positions between sitting, standing, and walking for comfort (Tr. 460).

[Doc. 22, pgs. 3-6]. The Court did not include the defendant's synopsis of the evidence regarding the plaintiff's mental impairment because the plaintiff has raised no issue in this judicial review regarding the ALJ's findings in that respect.

As noted by the plaintiff in her brief, the examination of Dr. Varva mentioned above noted a positive left leg raise (Tr. 566). Also, the Court notes that Dr. Brasfield opined that the

4

February 15, 2008 MRI showed "a left L5 disc herniation that is both contacting and displacing the left S1 nerve root, consistent with the patient's radicular pain." (Tr. 608). Dr. Brasfield's report was not before the ALJ, but was presented initially to the Appeals Council.

With regard to straight-leg raising, the Court notes that the Commissioner, in the above description of Dr. Filka's consultative examination, did not specifically mention Dr. Filka's finding that the plaintiff had negative straight leg raising (Tr. 459).

Also not described in the summary of the medical evidence is the evaluation of June 18, 2014 by Tri-State Mountain Neurological Associates. As was the case with Dr. Brasfield's report, this was initially presented to the Appeals Council. This one-page office note states that the plaintiff "presented for evaluation of dizziness." (Tr. 615). She also complained of "difficulty with ambulation due to significant low back pain and left leg discomfort." The note goes on to state that "[a]pparently, she is applying for disability and her attorney reportedly informed her that she needs to have a nerve test and a straight leg test. She had an MRI of her low back scheduled recently, but he instructed her to cancel this as he apparently felt that this study would not be beneficial for her disability case." (Tr. 615). The examination itself revealed full strength throughout the proximal and distal upper and right lower extremities with "faint weakness in the left lower extremity, with a prominent give-way component (back pain)." (Tr. 615). Light touch was intact. Her gait was antalgic, but not ataxic. Also, it was noted she had a positive straight leg test on the left. The doctor "also suggested that she have a repeat MRI of the lumbar spine." (Tr. 615). He stated that "[m]y concern is appropriately evaluating her condition, rather than getting her approved for disability." (Tr. 615). The treatment note closed stating that the plaintiff could call with questions or concerns, and that "otherwise she will follow

up in 3 months." (Tr. 615).

The ALJ conducted an administrative hearing with regard to the plaintiff's claims on May 14, 2014. At the commencement of the hearing, Plaintiff's counsel advised the Court that her position was that she met Listing 1.04(A) of the Listings of Impairments (Tr. 32), therefore indicating that she should thus be found disabled at Step Three of the sequential evaluation process set forth above. The testimony of plaintiff and her witnesses is summarized in the plaintiff's brief as follows:

> The claimant testified at her hearing held on May 14, 2014. She reported that her primary physical problems surrounded the pain in her lower back and into her left leg. (TR 36) She stated the pain radiated into her left leg down to her knee and it did so on a fairly consistent basis. (TR 36) She indicated at the time of her testimony she was feeling that same pain radiating into her left leg. (TR 36). The pain affects her ability to sit, stand and walk. She indicated she could only sit for five to 10 minutes when her back begins to hurt, when she then stands up to walk around or move around, ultimately requiring her to try to sit back down again and end up lying down due to the pain. (TR 37) She indicates laying down is the most comfortable position for her. (TR 37) She resigns to laying down three to four hours out of the day for relief. (TR 37) When she goes shopping for groceries she feels the pain to begin in her lower back and into her left leg after about 10 minutes. When it happens she has to go to the front of the store and sit on a bench until she gets some relief then gets back up and walks again. (TR 38) Household chores were burdensome and impractical to perform. She stated she has trouble vacuuming and has to sit down after a few minutes, the same with loading and unloading the dishwasher. Taking a shower causes her pain. (TR 39) She testified to having trouble dressing putting on her socks and shoes and often required assistance. (TR 39) During the hearing the claimant had to stand up to relieve her discomfort. (TR 42).
> Prior to the accident in 2006 the claimant described her lifestyle as lived like a person "high on life." (TR 43) She was involved with her son, loved to work, cooked all the time and did about anything and everything she wanted. (TR 43) Now the pain in her back has interfered with her personal life, whereas she has been unable to have sexual relations due to the pain. (TR 44) The pain keeps her from sleeping and has caused an increase in depressive symptoms. (TR 46).
> She testified to being on Suboxone at one time but having now weaned off of it and takes prescription strength Ibuprofen and uses ice packs and a heating pad to relieve the pain. (TR 44-46).
> Bradley Kelly, the claimant's only son, testified at the hearing. He

6

described his mother prior to the accident in 2006 as "totally different" than she is now. (TR 48) She use to get up early at around 4:00 in the morning and get ready for work. Her house was spotless. "She could do anything she wanted." (TR 48) Now, he described her as simply unable to do much of anything. She stays in bed all day depending on how she feels, when she gets up and moves around for five to 10 minutes she has to sit back down. (TR 48) He mentions her commonly grabbing her left side when trying to get around and leaning to the right. She stops and sits all the time to take pressure off of her left side. He explained that she can't stand up or sit down too long and appears to never be comfortable in any one position. (TR 49) He observed that she tries to clean the house and he described as "horrible to watch." (TR 49) She gets up and tries for five to ten minutes and has to sit back down. (TR 49) He explained that her house is like a "pig sty" compared to how she use to keep up her home. (TR 49) She use to take pride in everything she did. (TR 50) He testified that he had been shopping with her on plenty of occasions at Walmart and she tires out after going down three aisles and has to sit down or go sit in the truck until he gets done. (TR 50) He indicated she has a number of crying spells complaining of her life status, unable to do various things, to go anywhere, not be with the grandkids. He described her as appearing "heartbroken, honestly I mean it's completely different. When I was young, you know, when I was my kids age, I mean she would take us everywhere. We were always out. There was no sitting around. She hated being at home." (TR 51).

      Mike Wilson, the claimant's boyfriend with whom she had resided for 7 years, testified on the claimant's behalf. He indicated he had known the claimant since she was 12 years old. (TR 53) Mr. Wilson and the claimant had just began dating about a week before she injured her back in 2006. He testified that the claimant attempted to work at the Skate Inn he ran and lasted approximately 10 days and simply couldn't handle the concessions. (TR 54) He testified that the claimant's mother and her son help her out with the house and he helped her out but his job kept him gone a lot. (TR 54) He testified that she appears to hurt no matter what she does. She can't vacuum, dust, reach, or bend without hurting. (TR 54) He explained that when he comes home from work she is laying on the couch and trying to get her back pain to ease off. (TR 55) She doesn't cook much and he has to buy take home meals most of the time. (TR 55) He has observed her favoring her right side most of the time. She lays over on her right side to ease the pain on her left side. (TR 57).

[Doc. 20, pgs. 7-9].

At the hearing, the ALJ took the testimony of Dr. Robert S. Spangler, a vocational expert ["VE"]. Dr. Spangler was asked to assume a person who "could do light work with occasional posturals, no ropes; ladders; scaffolds; overhead reaching; occasional bilaterally; avoid

7

concentrated exposure to hazards; and concentrated exposure to vibrations; limited to simple; unskilled work; occasional contact coworkers; supervisors; and the public." (Tr. 59). Dr. Spangler identified a substantial number of jobs in the regional and national economies which such a person could perform (Tr. 59).[1]

On June 18, 2014, the ALJ filed his hearing decision. After explaining the sequential evaluation process used to determine disability, he found that the plaintiff was not engaged in substantial gainful activity (Tr. 13). He then found she had severe impairments of degenerative disc disease, osteoarthritis, obesity, a major depressive disorder and a history of substance abuse (Tr. 14).

In the next step of the sequential evaluation process, he found that the plaintiff did not have any impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (Tr. 14). This will be discussed in detail below.

Before proceeding to Step Four, the ALJ found that the plaintiff had the residual functional capacity ["RFC"] described above in his hearing questioning of Dr. Spangler. In this regard, he discussed the medical evidence. In particular, he mentioned in detail the report of Dr. Lorio, the examination results of Dr. Filka, and plaintiff's consultative psychological examination, all as set out in the medical history summary described above (Tr. 16-20). Based upon the VE's testimony, he then, at Step Five, found that a significant number of jobs existed in the national economy (Tr. 20-21). Accordingly, he found that the plaintiff was not disabled (Tr. 21).

---

[1] Neither the plaintiff nor the Commissioner has raised any issues regarding the number of jobs identified by the VE, or that they would not constitute a significant number.

Plaintiff asserts that "[t]he ALJ erred in failing to consider Listing 1.04(A) in determining the claimant's eligibility for benefits or in the alternative, new and material evidence supports the contention that the claimant met and continues to meet Listing 1.04(A), found at 20 CFR Ch. III, Pt. 404, Supt. P, App. 1. [Doc. 20, pg. 2]. This is, as plaintiff further asserted, "the sole issue raised in this case…." [Doc. 23, pg. 1]. To paraphrase, plaintiff maintains that the ALJ should have found, based on the evidence before him, that the plaintiff was disabled at Step Three of the sequential evaluation process because she met Listing 1.04(A), and that, in any event, she should have been found disabled on that same ground based upon evidence submitted to the Appeals Council. The evidence submitted in the first instance to the Appeals Council consisted of Dr. Brasfield's August 25, 2009 evaluation (Tr. 607-609), and the June 18, 2014 treatment note of Tri-State Mountain Neurology (Tr. 615), both of which are described in detail in the recitation of the medical evidence set out above.

The listings set out under section 1.00 of the regulations deal with disorders of the musculoskeletal system. In order to be found disabled at Step Three based upon any listing, a plaintiff "must first present medical findings that satisfy each criterion of the particular listing." *Lee v. Commissioner of Soc. Sec.*, 529 Fed. Appx. 706, 710 (6th Cir. 2013), citing 20 CFR, § 404.25(d). Also, "[f]or a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Sullivan v. Zebley*, 493 U.S. 521, 530, 110 S. Ct. 885, 891, 107 L. Ed. 2d 967 (1990). Furthermore "[b]ecause satisfying the listings yields an automatic determination of disability…the evidentiary standards [at Step Three] … are more strenuous than for claims that proceed through the entire five-step evaluation." *Peterson v. Comm'r of Soc.*

9

*Sec.*, 552 Fed. Appx. 533, 539 (6th Cir. 2014). Also, Section 1.00(D), applicable to all musculoskeletal listings, requires that physical examinations be very specific.

> [They] must include a detailed description of the…findings appropriate to the specific impairments being evaluated. These physical findings must be determined on the basis of objective observation during the examination and not simply a report of the individual's allegation; e.g. "He says his leg is weak, numb." Alternative testing methods should be used to verify the abnormal findings; e.g. a seated straight-leg raising test in addition to a supine straight-leg raising test. Because abnormal physical findings may be intermittent, their presence over a period of time must be established by a record of ongoing treatment and evaluation. Care must be taken to ascertain that the reported examination findings are consistent with the individual's daily activities.

Thus, consistent clinical observation over time is required as to each component necessary to meet a particular listing.

> Listing 1.04, in pertinent part, reads as follows:
>
> 1.04 *Disorders of the spine* (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equine) or the spinal cord. With
>
> (A) Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine).

*Id.* Plaintiff asserts first that the ALJ, and later the Appeals Council, failed to address Listing 1.04(A). In this regard, the ALJ stated that he "has considered the claimant's degenerative disc disease and osteoarthritis (Listing 1.00) but concludes that the claimant's conditions do not satisfy the severity requirements of the listed impairments, as she does not have the required deficits." (Tr. 14). At the commencement of the administrative hearing, plaintiff's counsel prefaced the presentation of the case with the underlying assertion that the plaintiff met the

10

requirements of Listing 1.04(A). The Court does not agree that the ALJ's statement that plaintiff failed to meet any musculoskeletal listing, which would, of course, include Listing 1.04(A), is error in and of itself. Undoubtedly, the ALJ is required to discuss the evidence which would support a conclusion that a claimant does not meet a listed impairment. However, that discussion does not have to take place in its entirety in the portion of the opinion where the Step Three finding is announced. See *Staggs v. Astrue*, 2011 WL 3444014, (M.D. Tenn. 2006), citing *Bledsoe v. Barnhart*, 165 Fed. App'x 408, 411 (6th Cir. 2006). The Court in *Staggs* stated that

> [a]n ALJ's explanation of his step-three determination need not be elaborate. The Sixth Circuit has consistently rejected a heightened articulation standard, noting in *Bledsoe v. Barnhart* that the ALJ is under no obligation to spell out 'every consideration that went into the step three determination' or 'the weight he gave each factor in his step three analysis,' or to discuss every single impairment…..Nor is the procedure so legalistic that the requisite explanation and support must be located entirely within the section of the ALJ's decision devoted specifically to step three; the court in *Bledsoe* implicitly endorsed the practice of searching the ALJ's entire decision for statements supporting his step three analysis.

*Id.* at *3.

The plaintiff points out that the ALJ emphasized the fact that Dr. Loria found that one of the plaintiff's MRIs "suggested a significant posterior displacement of the left S1 nerve root sheath and **possible** impingement of the right S1 nerve root sheath…." (Tr. 16)(emphasis in original). There is no doubt that there is substantial evidence that plaintiff has a nerve root affected by a displaced disc. However, Listing 1.04(A) requires much more.

It is true that Dr. Varva, Dr. Brasfield, and Tri-State Mountain Neurological Associates observed positive straight leg raising to some degree. However, the listing requires a positive straight leg raising test in *both* the sitting and supine positions. There is no evidence that she had

11

positive straight leg raising in both required positions. See *Plaghe v. Comm'r of Soc. Sec.*, No. 15-11920, 2016 WL 1714733, at *14 (E.D. Mich. Apr. 28, 2016) (collecting cases establishing that a "[l]ack of evidence that the straight-leg test was positive in both the sitting and supine position is itself sufficient to preclude a claimant from meeting Listing 1.04A").

However, even assuming that she did have positive straight leg raising in both positions during these examinations, there exists the consultative exam of Dr. Filka. She observed that the plaintiff had "negative sacral notch tenderness and *negative straight leg raising*." (Tr. 459). Dr. Filka also observed that the plaintiff had 5/5 strength in both upper and lower extremities with no atrophy. She noted a normal gait, and no difficulty in making postural changes from sitting to laying, laying to sitting, sitting to standing, and bending. Also, Dr. Filka observed that "[f]orward flexion of lumbar spine is 90 degrees with normal extension, lateral bending, and rotation." (Tr. 459). All of these clinical observations contradict the assertion that plaintiff meets Listing 1.04(A).

Thus, the Court finds that there is clearly substantial evidence supporting the ALJ's and Appeals Council's ultimate conclusion that the plaintiff did not have the required limitation of motion of the spine, motor loss or positive straight leg raising required by this listing. While there is evidence in the reports submitted by the plaintiff that she met at least some of the criteria of the listing, the ALJ is the trier of fact. If substantial evidence supports his finding that the plaintiff did not meet *all* of the requirements of a listing, then he must be affirmed. *Listenbee,* 846 F.2d at 349; *Zebley*, 493 U.S. at 530.

In any event, there is also considerable evidence, as stated by the ALJ, that the plaintiff can sit, stand, walk and move about in a satisfactory manner (Tr. 19). The medical evidence

simply does not appear to support a finding that her severe back impairment approaches listing-level severity.

There is no argument raised regarding the ALJ's RFC finding, other than that it should not have been reached, or that the jobs identified by the VE do not constitute a substantial number of jobs which could be performed by a person possessing that RFC. Since substantial evidence supports the ALJ's determination that the plaintiff does not meet any of the musculoskeletal listings, it is respectfully recommended that the plaintiff's Motion for Judgment on the Pleadings [Doc. 19] be DENIED, and that the defendant Commissioner's Motion for Summary Judgment [Doc. 21] be GRANTED.[2]

                                                Respectfully submitted,

                                                 s/ Clifton L. Corker
                                                United States Magistrate Judge

---

[2] Any objections to this report and recommendation must be filed within fourteen (14) days of its service or further appeal will be waived. 28 U.S.C. 636(b)(1).